### IN THE UNITED STATES COURT OF APPEALS
### FOR THE FIFTH CIRCUIT

13-40044

United States Court of Appeals
Fifth Circuit
**FILED**
January 31, 2014
Lyle W. Cayce
Clerk

NADIYA WILLIAMS-BOLDWARE,

        Plaintiff-Appellee Cross-Appellant,

v.

DENTON COUNTY, TEXAS,

        Defendant-Appellant Cross-Appellee.

Appeals from the United States District Court
for the Eastern District of Texas

Before STEWART, Chief Judge, and JOLLY and SMITH, Circuit Judges.

CARL E. STEWART, Chief Judge:

This cross-appeal involves challenges to the district court's rulings in a suit alleging, *inter alia,* that the plaintiff was subjected to a hostile work environment based upon her race. Nadiya Williams-Boldware ("Williams-Boldware"), an African American Assistant District Attorney, filed suit against Denton County, the Denton County District Attorney's Office ("DA's Office"), and three Assistant District Attorneys ("Individual Defendants") in their individual capacities. The district court dismissed all claims against the DA's Office and the Individual Defendants, and certain claims against Denton County. Williams-Boldware's hostile work environment claim against Denton County proceeded to trial. The jury found in favor of Williams-Boldware and

awarded damages for past mental pain, physical pain, and future mental pain. The district court ruled, as a matter of law, that Williams-Boldware was not entitled to damages for physical pain or future mental pain.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The Denton County DA's Office hired Williams-Boldware in 2007 as a misdemeanor prosecutor. On April 2, 2009, a Caucasian male Assistant District Attorney, Cary Piel ("Cary"), walked into Williams-Boldware's office to discuss a case he was preparing for trial. The case involved an African American woman who had driven through and desecrated a historic cemetery. When police responded to the scene, the woman spewed "very racist language at them." Cary told Williams-Boldware that the woman's actions "made him understand why people hung people from trees" and also made him "want to go home and put on his white pointy hat." Cary is a self-described "redneck." Williams-Boldware told Cary that she did not approve of racist remarks made by individuals of any race and pointed out that Cary was engaged in the same conduct about which he originally complained. After informing Cary that his comments were inappropriate and upsetting, Williams-Boldware walked out of her office, leaving Cary behind. Several minutes later, Cary sent Williams-Boldware an email apologizing for his comments.

Williams-Boldware received the email while she was driving home. During the drive, Williams-Boldware was "pretty hysterical and crying" and had to "pull over to collect herself." She then contacted two colleagues, including her immediate supervisor, Michael Graves, and explained what happened during her conversation with Cary.

The next morning, Williams-Boldware learned that Graves reported the incident to the DA's Office's leadership. Shortly thereafter, Graves arranged a meeting with the District Attorney ("DA") and the First Assistant DA during which Williams-Boldware "told them everything." Williams-Boldware made

clear that she wanted to handle the situation professionally and desired to speak with Cary "face to face." The leadership honored Williams-Boldware's wishes and did not take any action before Williams-Boldware met with Cary. Before approaching Cary, Williams-Boldware met with his wife, Susan Piel ("Susan"). Susan was a supervisor and Williams-Boldware considered her a friend. Susan gave Williams-Boldware "her blessing to say whatever [she] wanted to Cary."

Williams-Boldware then met with Cary to explain that she was offended by his remarks. Cary offered another apology but Williams-Boldware did not believe Cary's apology was genuine. Williams-Boldware then met with Susan again and they "hugged and cried together." Williams-Boldware told the DA's Office's leadership that she spoke with Cary and that they "needed to handle it" from there. The First Assistant DA emailed Williams-Boldware to inform her that Cary would receive a reprimand and be required to participate in a diversity training. The DA also transferred Williams-Boldware to a different misdemeanor division so that she would no longer be required to report to Susan.

On July 2, 2009, Williams-Boldware overheard Cary speaking to someone about his need for a "boombox" to play a tape during a trial. Williams-Boldware heard Cary state: "I better watch what I say or else I'll have to take another one of those classes." Williams-Boldware believed that Cary was "taunting [her] in some fashion in front of [her] coworkers." Williams-Boldware suggested at trial that Cary was intimating that the term "boombox" was associated with African American culture and if he said anything remotely related to African Americans, he would be required to attend another diversity training. However, the evidence at trial did not show that the comments were directed at Williams-Boldware or that Cary knew that Williams-Boldware was within earshot when he made the comments.

On July 30, 2009, Williams-Boldware hand-delivered a letter to the DA reporting the "boombox" incident. The letter also alleged, for the first time, that soon after Williams-Boldware reported Cary's initial remarks, John Rentz, another Assistant DA, walked by her office and called her a "troublemaker." Williams-Boldware testified at trial that she believed this comment was also racially motivated. According to Williams-Boldware's trial testimony, Cary's statement regarding his "white pointy hat" and hanging people from trees, the "boombox" remark, and the "troublemaker" comment were the sum of incidents she believed to be racially motivated.

Williams-Boldware believed that the DA's Office was insufficiently concerned about her complaint. As a result, she submitted a letter to the Denton County Human Resources Office ("HR") expressing her dissatisfaction. HR emailed Williams-Boldware assuring her that Denton County took her allegations seriously and that they were working to accomplish a resolution. HR concluded that Cary's comments were inappropriate but did not impose any punishment in addition to the reprimand and order to attend diversity training. HR also decided that the "troublemaker" comment was not conclusively racially harassing conduct. Despite the inconclusive finding, HR mandated that Rentz attend diversity training.

On December 1, 2009, Williams-Boldware filed suit against Denton County, the DA's Office, Cary Piel, Susan Piel, and Ryan Calvert. On February 3, 2010, Williams-Boldware filed an amended complaint that alleged, *inter alia*, that Denton County and the DA's Office engaged in race and color harassment and discrimination pursuant to 42 U.S.C. § 2000e ("Title VII"). It also alleged that the Individual Defendants engaged in race and color harassment and discrimination pursuant to 42 U.S.C. § 1981 "by and through" 42 U.S.C. § 1983. After several months of motions practice, the district court dismissed all claims against the DA's Office and the Individual Defendants.

The case proceeded to trial in June 2012 and the jury found in favor of Williams-Boldware on her hostile work environment claim against Denton County. The jury awarded damages in the amount of $170,000 on each of Williams-Boldware's three damage claims: (1) past mental pain, humiliation, embarrassment, depression, anger, emotional distress and damage to reputation ("past mental pain"); (2) past physical pain and suffering ("past physical pain"); and (3) future mental pain, humiliation, embarrassment, depression, anger, emotional distress, and damage to reputation ("future mental pain").

At the close of Williams-Boldware's case and again at the close of all of the evidence, Denton County moved for judgment as a matter of law. The district court found that the evidence presented at trial supported the jury's verdict on the hostile work environment claim. The district court ruled, however, that there was "no legally sufficient evidentiary basis to find that the hostile work environment proximately caused [Williams-Boldware's] physical pain and suffering or to find that she would suffer from mental anguish in the future." The damage award for past mental anguish was the only award that survived the district court's post-trial judgment.

On appeal, Denton County argues that the district court erred by not granting its motion for judgment as a matter of law in its entirety. Denton County claims that the evidence presented at trial was insufficient to prove that Williams-Boldware experienced a hostile work environment and, even if she did, its prompt remedial action defeats Williams-Boldware's claim. Denton County further argues that Williams-Boldware did not prove that Denton County's conduct caused her any damages.

Williams-Boldware argues that the district court erred by dismissing the the Individual Defendants from the law suit and denying her discovery on her failure to promote claim. She also asserts that the district court erred by

eliminating the jury's damage awards for physical pain and future mental pain.

## II. DISCUSSION

### A.  Hostile Work Environment Claim Against Denton County

#### 1.  Standard of Review

"A motion for judgment as a matter of law . . . in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235 (5th Cir. 2001) (citation and internal quotation marks omitted) (alteration in original). "Although we review denial of a motion for judgment as a matter of law de novo, we note that our standard of review with respect to a jury verdict is especially deferential." *SMI Owen Steel Co., Inc. v. Marsh USA, Inc.*, 520 F.3d 432, 437 (5th Cir. 2008) (per curiam) (citation and internal quotation marks omitted). "A court should grant a motion for judgment as a matter of law only when the facts and inferences point so strongly in favor of the movant that a rational jury could not reach a contrary verdict." *Id.* (citation and internal quotation marks omitted).

#### 2.  Applicable Law

To establish a hostile work environment claim under Title VII, the plaintiff must prove that she:

> (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (citation omitted).

A defendant may avoid Title VII liability when harassment occurred but the defendant took "prompt remedial action" to protect the claimant. *Hockman*

*v. Westward Commc'ns, LLC*, 407 F.3d 317, 329 (5th Cir. 2004). What constitutes prompt remedial action is a fact-specific inquiry and "not every response by an employer will be sufficient" to absolve the employer of liability under Title VII. *Id.* (citation and internal quotation marks omitted). An "employer may be liable despite having taken remedial steps if the plaintiff can establish that the employer's response was not reasonably calculated to halt the harassment." *Id.* (citation and internal quotation marks omitted).

In certain circumstances, we have held "that an employer took prompt remedial action as a matter of law." *Id.* (citing *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 616 (5th Cir. 1999); *see also Carmon v. Lubrizol Corp.*, 17 F.3d 791, 794–95) (5th Cir. 1994) (per curiam); *Dornhecker v. Malibu Grand Prix Corp.*, 828 F.2d 307, 309–10 (5th Cir. 1987)). In *Carmon*, we held that an employer took prompt remedial action because "[i]t took the allegations seriously, it conducted prompt and thorough investigations, and it immediately implemented remedial and disciplinary measures based on the results of such investigations." 17 F.3d at 795; *see also May v. Fedex Freight East, Inc.*, 374 F. App'x 510, 513 (5th Cir. 2010) (per curiam) (unpublished).

Employers are not required to impose draconian penalties upon the offending employee in order to satisfy this court's prompt remedial action standard. *See Kreamer v. Henry's Towing*, 150 F. App'x 378, 382 (5th Cir. 2005) (per curiam) (unpublished) (stating that "an employer need not impose the most severe punishment to comply with Title VII"). For example, in *Waymire v. Harris Cnty., Tex.* 86 F.3d 424, 429 (5th Cir. 1996), we held that even where an offending co-worker "exercised extremely poor judgment . . . one instance of poor judgment does not require that [the offending employee] be fired." We also reasoned that in circumstances where the offending conduct is infrequent or isolated, a reprimand may qualify as a prompt remedial measure. *Id.*

7

In *Houston v. EBI Cos.*, 53 F.3d 1281 (5th Cir 1995) (per curiam) (unpublished), the plaintiff, an African American registered nurse, complained that a Caucasian doctor made a racially offensive comment to her. *Id.* at *1. The plaintiff's supervisor immediately reported the complaint to the hospital's leadership. *Id.* The leadership promptly advised the doctor "that racially offensive language would not be tolerated and that he must not make such remarks in the future." *Id.* The doctor's conduct improved and he did not make any other racist remarks in the plaintiff's presence. *Id.* We held that the hospital's response to the complaint constituted prompt remedial action. *Id.* at *2.

Furthermore, "in determining whether the employer's actions were remedial, we have considered whether the offending behavior in fact ceased." *Skidmore*, 188 F.3d at 616 (citing *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999)).

### 3. Analysis

Denton County argues that because the verdict and judgment below were based upon "a single racially-offensive utterance," the evidence supporting the verdict was insufficient, as a matter of law, to establish a hostile work environment claim. In the alternative, Denton County asserts that Williams-Boldware's claim fails because it took prompt remedial action to prevent any further harassing conduct. For the reasons explained *infra*, we conclude that Denton County is entitled to judgment as a matter of law because it took prompt remedial action calculated to halt the harassment. Accordingly, we "need not address whether the conduct in question was sufficiently severe or pervasive to create a hostile work environment." *Hirras v. Nat'l R.R. Passenger Corp.*, 95 F.3d 396, 399 (5th Cir. 1996) (per curiam); *Waymire*, 86 F.3d at 428.

"Whether an employer's response to discriminatory conduct is sufficient will necessarily depend on the particular facts of the case—the severity and persistence of the harassment, and the effectiveness of any initial remedial steps." *Hirras*, 95 F.3d at 399–400 (citation and internal quotation marks omitted). Although we decline to decide whether the harassing conduct at issue in this case was sufficiently severe or pervasive to prove a hostile work environment claim, we briefly focus on the severity and persistence of the conduct to determine whether Denton County responded with sufficient remedial measures.

The evidence presented at trial demonstrates that Williams-Boldware believed that three incidents constituted racial harassment.[1] These incidents did not involve a protracted outpouring of racially invidious harassment that required large-scale institutional reform. Instead, Denton County was required to implement prompt remedial measures to prevent Cary, and anyone else, from engaging in racially harassing conduct toward Williams-Boldware.

Denton County's response to Williams-Boldware's initial complaint could not have been more prompt. Less than twenty-four hours after the complaint, Williams-Boldware was in a meeting with the DA and the First Assistant DA. During this meeting, she was afforded the opportunity to fully explain what she experienced. The DA's Office's leadership asked for her input on an appropriate response. She requested a meeting with Cary and her request was granted. Shortly thereafter, Denton County officials verbally reprimanded Cary and required that he attend a diversity training. They also ensured that Williams-Boldware would not be supervised by Cary's wife, Susan. In other

---

[1] Without question, Cary's initial comments were, at a minimum, racially insensitive. However, whether the "boombox" and "troublemaker" comments constitute racial harassment is unclear. Even if we assume that all three comments were racially harassing, the conduct was fairly isolated and Williams-Boldware admitted at trial that she never felt threatened or intimidated by Cary.

cases, we concluded that similar measures constituted prompt remedial action. *Skidmore*, 188 F.3d at 615–16 (holding that the employer took prompt remedial action when it admonished the harasser and transferred the plaintiff to a new shift); *Briones v. Caleb Brett USA, Inc.*, 69 F.3d 535, *3 (5th Cir. 1995) (per curiam) (unpublished) (same).

Moreover, the evidence presented did not demonstrate that any racially harassing conduct persisted after Cary was reprimanded and compelled to attend a diversity training class. *See Skidmore*, 188 F.3d at 616 (indicating that the cessation of offending behavior is evidence that an employer's actions were sufficiently remedial). Williams-Boldware argues that Cary's "boombox" comment demonstrated that he did not take the diversity training seriously. Whether Cary took the training seriously is not entirely determinative. Instead, the relevant inquiry is whether Cary harassed Williams-Boldware because of her race subsequent to Denton County's reprimanding him and requiring that he attend diversity training. Williams-Boldware presented no evidence that Cary continued making similar comments nor did she show that other employees harassed her because of her race. In fact, Denton County compelled John Rentz to attend a diversity training class even though the alleged "troublemaker" comment was deemed "inconclusive" with respect to whether it was racially harassing. Also, there was no evidence that Rentz made similar comments subsequent to his compelled diversity training.

Denton County took seriously Williams-Boldware's complaints and its remedial efforts effectively halted the racially harassing conduct of which she complained. Therefore, we conclude that the evidence does not support a

hostile work environment claim and Denton County is entitled to judgment as a matter of law.[2]

## B. Dismissal of the Individual Defendants

In Williams-Boldware's amended complaint, she claimed that the Individual Defendants, *inter alia*, denied her a promotion because of her race in violation of § 1981. The Individual Defendants filed a motion to dismiss Williams-Boldware's failure to promote claims pursuant to Fed. R. Civ. P. 12(b)(6). They also moved to dismiss based upon qualified immunity. The district court ordered Williams-Boldware to file a Rule 7 reply on the issue of qualified immunity. More specifically, the district court's order required that Williams-Boldware explain what promotions she was denied, who denied the promotions, and how the Individual Defendants were involved in the alleged denial of a promotion.

In her Rule 7 Reply, Williams-Boldware alleged that some non-African American misdemeanor prosecutors were provided multiple opportunities to work on advanced level prosecutions and felonies. She claimed that working on those types of cases is a gateway to advancement in the DA's Office. Williams-Boldware asserted that Susan Piel's permission would have been required for her to work on an advanced level prosecution. She surmised that because she had not worked on any advanced level prosecutions, Susan must not have recommended her for such opportunities. Furthermore, she claimed that Susan relied upon and utilized input and guidance from Cary Piel and Ryan Calvert in making her decisions with respect to the advancement and promotion of misdemeanor prosecutors. Williams-Boldware requested limited discovery on the issue of the participation and involvement of the Individual

---

[2] Because we conclude that Denton County is entitled to judgment as a matter of law, we do not address the parties' arguments with respect to damages.

Defendants in the DA's Office's promotion process. The district court denied her requests.

The district court found that Williams-Boldware failed to allege sufficient facts to support a failure to promote claim against the Individual Defendants that would be plausible under the *Iqbal* and *Twombly* standards. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). Accordingly, the district court dismissed Williams-Boldware's failure to promote claim against the Individual Defendants on the basis of qualified immunity.

On appeal, Williams-Boldware challenges the district court's denial of discovery with respect to her failure to promote claim and its dismissal of the Individual Defendants from the case.

### 1. Standard of Review

"We review a district court's denial of discovery for abuse of discretion." *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 209 (5th Cir. 2009). The grant of a motion to dismiss based upon qualified immunity is reviewed de novo. *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008).

### 2. Applicable Law

A plaintiff asserting racial discrimination for failure to promote establishes a prima facie case by satisfying the following conditions: "(1) the employee is a member of the protected class; (2) [s]he sought and was qualified for the position; (3) [s]he was rejected for the position; (4) the employer continued to seek applicants with the plaintiff's qualifications." *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 354–55 (5th Cir. 2001).

We engage in a two-step analysis to assess a public official's claim of qualified immunity. *Foley v. Univ. of Hous. Sys.*, 355 F.3d 333, 337 (5th Cir. 2003). "First we must determine whether the plaintiff has made a sufficient showing that the official violated a clearly established constitutional or

statutory right. If the answer is in the affirmative, we then ask whether the official's actions were objectively reasonable in light of the clearly established right." *Id.* "The basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation, including avoidance of disruptive discovery." *Iqbal*, 556 U.S. at 685 (citation and internal quotation marks omitted). "Discovery . . . must not proceed until the district court *first* finds that the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity." *Wicks v. Miss. State Emp't Servs.*, 41 F.3d 991, 994 (5th Cir. 1995). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). A complaint will also fall short if it simply provides "naked assertion[s]" lacking "further factual enhancement." *See Twombly*, 550 U.S. at 557.

### 3. Analysis

Williams-Boldware did not plead this cause of action with the requisite specificity to defeat a motion to dismiss based upon qualified immunity. "One of the most salient benefits of qualified immunity is protection from pretrial discovery, which is costly, time consuming, and intrusive." *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012). Before allowing discovery in a matter where qualified immunity is alleged, the district court must first find "that the plaintiff's pleadings assert facts which, if true, would overcome" a qualified immunity defense. *Id.* (citation and internal quotation marks omitted). Here, Williams-Boldware's failure to promote claim did not plead facts that would overcome a qualified immunity defense because her allegations are conclusory statements based almost wholly upon speculation. *See Iqbal*, 556 U.S. at 679 (explaining that conclusory statements are "not entitled to the assumption of truth").

Williams-Boldware speculates that Susan declined to recommend or approve her for more challenging assignments, but provides no facts to support her allegation. She also speculates that Cary Piel and Ryan Calvert were involved in selecting misdemeanor prosecutors for coveted assignments, but provides no factual support for that allegation. Most notably, Williams-Boldware failed to even allege that she applied for a promotion and was rejected. Under certain circumstances, a failure to promote claim is viable even when the employee never applied for a position. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 406 (5th Cir. 1999). However, the employee must demonstrate that applying "would have been a futile gesture." *Id.* Williams-Boldware made no such showing.

Because Williams-Boldware failed to plead facts sufficient to survive a motion to dismiss on her failure to promote claim, the district court did not err by denying discovery and dismissing the suit against the Individual Defendants.

### III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's denial of judgment as a matter of law with respect to the hostile work environment claim and RENDER judgment in favor of Denton County. We AFFIRM the district court's dismissal of the Individual Defendants.